Approved: _____/s/_____
JACOB R. FIDDELMAN
Assistant United States Attorney

Before:   HONORABLE SARAH L. CAVE
          United States Magistrate Judge
          Southern District of New York

------------------------------------X
                                    :   COMPLAINT   20mj 8053
UNITED STATES OF AMERICA            :
                                    :   Violation of 21 U.S.C.
        - v. -                      :   § 846
                                    :
ABDULLA SULEIMAN,                   :   COUNTY OF OFFENSE:
                                    :   NEW YORK
                Defendant.          :
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss:

RAYMOND MCGRATH, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

COUNT ONE
(Narcotics Conspiracy)

1. In or about July 2020, in the Southern District of New York and elsewhere, ABDULLA SULEIMAN, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that ABDULLA SULEIMAN, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that ABDULLA SULEIMAN, the defendant, conspired to distribute and possess with intent to distribute was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

1

The bases for my knowledge of the foregoing charge are, in part, as follows:

4.  I am a Special Agent with the DEA, and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.  Based on my participation in this investigation, including my personal observations, my review of recordings and law enforcement reports, draft transcripts of recorded communications, and my conversations with other law enforcement officers, I have learned the following, in substance and in part:

    a. Since 2019, the DEA has been investigating a drug trafficking organization ("DTO") transporting heroin from an overseas country ("Country-1") to the New York City area. In or about late 2019, foreign authorities intercepted a shipment of approximately five kilograms of a substance that tested positive for heroin, which the DTO intended to be transported to the New York City area for sale to buyers and subsequent redistribution.

    b. As part of that investigation, an undercover law enforcement officer ("UC-1") has positioned himself as an individual who has access to kilogram-level quantities of heroin in New York City for sale to others for distribution. As part of those undercover efforts, a phone number for UC-1 has been provided to various individuals as a way for individuals looking to purchase and redistribute heroin to contact UC-1. UC-1 has had several telephone conversations with a suspected overseas member of the DTO regarding that person's efforts to identify buyers for the above-referenced five kilograms of heroin in New York City, and to put such buyers in contact with UC-1 for purposes of delivering the heroin (which, as described above, had in fact been intercepted). While payment for the heroin was not explicitly discussed on these calls, based on my training and experience, I know that DTOs often arrange for payment for narcotics through separate channels in order to reduce the possibility of law enforcement detection and/or interception.

c.  As part of these undercover efforts, on several dates in or about late July 2020, UC-1 spoke by telephone with a coconspirator not named herein ("CC-1"). CC-1 stated, in substance and in part, that he had people for UC-1. Based on my training and experience and my involvement in this investigation, I believe that CC-1 was informing UC-1 that he had individuals ready to receive kilogram quantities of heroin as soon as UC-1 came into possession of narcotics.

d.  On or about July 20, 2020, UC-1 received an incoming phone call from a certain phone number ("Phone-1"). In substance and in part, the person using Phone-1, later identified as ABDULLA SULEIMAN, the defendant, as described below, stated that he would call UC-1 from another number. Based on my review of subscriber records for Phone-1, I have learned that Phone-1 is subscribed to in the name "Abdulla Suleiman" at a particular address in Brooklyn, New York that was later found on SULEIMAN's driver's license upon arrest, as described below.

e.  Approximately two minutes later, UC-1 received an incoming phone call from another phone number ("Phone-2"). UC-1 recognized the person calling using Phone-2 to be the same individual as had just called from Phone-1, i.e., SULEIMAN. In substance and in part, UC-1 told SULEIMAN that UC-1 would reach back out to SULEIMAN at a later date.

f.  On or about July 28, 2020, UC-1 missed several incoming phone calls from Phone-2. Later that day and the next day, UC-1 received text messages from CC-1 stating, in substance and in part, that UC-1 should call "him" back and providing the phone number for Phone-1 for UC-1 to call. Based on my training and experience and my involvement in this investigation, I believe that, after having several calls to UC-1 go unanswered, SULEIMAN likely contacted CC-1 and asked CC-1 to tell UC-1 to return SULEIMAN's calls, so that a narcotics transaction could be arranged.

g.  Later that day, on or about July 29, 2020, UC-1 spoke to CC-1 by telephone and informed CC-1, in substance and in part, that UC-1 had received a box with "ten." CC-1 stated, in substance and in part, that he had two individuals ready for UC-1, one of whom was SULEIMAN, and that UC-1 should give each "five." Based on my training and experience and my involvement in this investigation, I believe that CC-1 was proposing that UC-1 deliver "five" kilograms of heroin to each of two associates, one of whom was SULEIMAN and one of whom would be contacting UC-1 directly.

3

Thereafter, UC-1 communicated with SULEIMAN and arranged to meet on July 30, 2020 at a particular address in Manhattan, New York ("Location-1").

        h.    Law enforcement agents established surveillance at Location-1. UC-1 was present at Location-1 carrying a black bag containing five one-kilogram bricks of sham narcotics consistent with the appearance of heroin (the "Sham Kilograms"). At approximately 6:00 p.m., agents observed a black Mercedes vehicle ("Vehicle-1") arrive at Location-1. At approximately the same time, UC-1 received an incoming phone call from SULEIMAN, using Phone-2, during which SULEIMAN stated, in substance and in part, that he had arrived at Location-1 and was in a black car. SULEIMAN exited Vehicle-1 and met with UC-1. The ensuing transaction was observed by law enforcement and video recorded. UC-1 handed SULEIMAN the black bag, which was open, and SULEIMAN looked in the bag and saw the Sham Kilograms. UC-1 reached into the bag, and SULEIMAN stated, in substance and in part, not to do so and that SULEIMAN would just take the whole bag. Based on my training and experience, I believe that SULEIMAN was expressing concern about the possibility that UC-1 might have shown him kilograms of narcotics in plain view in public, which could risk detection by law enforcement. SULEIMAN then took the black bag, placed it in the back seat of Vehicle-1, and reentered Vehicle-1 to depart Location-1. Law enforcement agents then stopped Vehicle-1 and detained SULEIMAN. The black bag containing the Sham Kilograms, which remained open, was recovered from the back seat of Vehicle-1 under several other bags that were concealing it. SULEIMAN had in his possession several photograph identification cards that identified him as ABDULLA SULEIMAN, the defendant, and listed the address at which Phone-1 is subscribed.

        i.    Thereafter, SULEIMAN was advised of his *Miranda* rights and agreed to speak with law enforcement. In substance and in part, the following occurred during the interview. SULEIMAN stated that a friend of his, believed by law enforcement to be CC-1, had provided UC-1's phone number to SULEIMAN and instructed SULEIMAN to call UC-1. SULEIMAN claimed that he did not know what was in the bag he was picking up, but that he had been instructed by CC-1 to call CC-1 upon receipt of the bag to receive further instructions. SULEIMAN also stated that he has a prior conviction for a narcotics-related offense involving at least 500 grams of narcotics.

WHEREFORE, I respectfully request that ABDULLA SULEIMAN, the defendant, be imprisoned or bailed, as the case may be.

_____
RAYMOND MCGRATH
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
31st day of July, 2020

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK